# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

GAREN M. PEARSON,

      Plaintiff

v.

JAMES E. DZURENDA, et. al.,

      Defendants

Case No.: 3:19-cv-00031-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 58

      This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

      Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 58, 58-1 to 58-23, 60-1 to 60-2, errata at ECF Nos. 65, 65-1 to 65-4, 67-1.) Plaintiff filed a response. (ECF Nos. 63, 63-1, 64.) Defendants filed a reply. (ECF No. 69.)

      After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

      Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 4.) The events giving rise to this action took place when Plaintiff was housed at Lovelock Correctional Center (LCC). Defendants are: Dwayne Baze, Quentin Byrne (named by Plaintiff as Byrnes), Tara Carpenter, James Cox, James Dzurenda, Starlin Gentry, Robert LeGrand (named by Plaintiff as LeGrande), E.K. McDaniel (named by Plaintiff as McDaniels), Valaree Olivas, and

William Sandie (named by Plaintiff as Sandy). Defendant Michelle Moore was dismissed without prejudice under Federal Rule of Civil Procedure 4(m). (ECF No. 46.)

The court screened Plaintiff's complaint and allowed him to proceed with: retaliation claims against Dzurenda, McDaniel, Cox, LeGrand, Byrne, Carpenter, Baze, Olivas, Gentry, and Sandie; First Amendment interference with mail claims against Dzurenda, McDaniel, Cox, LeGrand, Byrne, Carpenter, Baze, Olivas, Gentry and Sandie; First Amendment interference with his receipt of photographs against Dzurenda, McDaniel, Cox, LeGrand, Byrne, Carpenter, Baze, Olivas, Gentry and Sandie; and an equal protection claim against Dzurenda, McDaniel, Cox, LeGrand, Byrne, Carpenter, Baze, Olivas, Gentry, and Sandie. (ECF No. 3.)

Plaintiff alleges that Olivas initiated a scheme to retaliate against him due to his filing of prison grievances, including denial of mail that did not violate prison regulations, false charges for violating NDOC regulations, and ultimately, transfer of Plaintiff to another prison against his wishes. He further avers that Olivas repeatedly interfered with his mail, and withheld letters and photographs from Plaintiff even though they did not violate the NDOC regulations. On multiple occasions, Plaintiff claims that Olivas intercepted Plaintiff's mail and did not tell Plaintiff or the sender that the mail had not been delivered, preventing an attempt to appeal the decision. He alleges that the other defendants were informed of the interference and did not act to prevent it.

He goes on to assert that Defendants withheld erotic photographs that were printed from websites that did not violate NDOC regulations and were similar to other photos allowed in the prison. He contends that Olivas withheld the photos based on personal feelings about the content or in retaliation, and Plaintiff notified the other defendants of the ongoing denial and they did not act to prevent it.

Finally, Plaintiff alleges that Olivas denied him access to erotic photographs from legal pornographic websites even though other inmates had access to similar photos. In addition, he was denied access to a photo of semi-nude boys in traditional sumo attire, even though this did not violate regulations and others were allowed to possess similar photos of semi-nude minors. He avers that he told the other defendants of these violations and they did not act to prevent the violation.

Defendants move for summary judgment, arguing: (1) Baze, Byrne, Carpenter, Cox, Dzurenda, Gentry, LeGrand, McDaniel and Sandie did not personally participate in any alleged constitutional violation; (2) Olivas did not initiate a scheme to retaliate against Plaintiff, but contacted authorities after documents Plaintiff received raised child pornography red flags and an investigation was conducted which ultimately led to the return of the items to Plaintiff; (3) Olivas flagged Plaintiff's mail because of the content of what was being sent and not because he wanted to interfere with the mail out of malicious spite; (4) they did not withhold erotic photographs from websites because of personal feelings about their content or in retaliation, but because the photographs were on the edge of a fine line of what is permissible under prison regulations; (5) Olivas did not deny Plaintiff access to erotic photographs from a legal pornographic website even though similar photos were allowed to other inmates because ultimately Plaintiff was given access to the photos after the investigation was conducted; (6) these claims are barred by the statute of limitations; and (7) Defendants are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex*, 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson*, 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex*, 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

# III. DISCUSSION

**A. Facts**

On March 13, 2015, the postal service delivered mail addressed to Plaintiff from J. Leroux, containing a letter and photographs. On March 16, 2015, Plaintiff was given an unauthorized mail notification, for a letter that included a 9 x 12 photo from J. Leroux that included an illegal act. (ECF No. 58-14.)

On March 26, 2015, Lieutenant Olivas contacted Sergeant Richard Akin of the Counter Exploitation Unit with the Vancouver Police Department in Vancouver, Canada, after mail was received at LCC for Plaintiff from Leroux (who apparently resided in Vancouver), which included photos of nude males, some of whom appeared to be under the age of 18. Sergeant Akin stated that Olivas would need to contact the Department of Homeland Security, who would in turn contact Canada's Homeland Security department, who would then contact the Vancouver Police Department. Olivas contacted Steve Martinez of the U.S. Department of Homeland Security, and was eventually put in touch with FBI Agent Dave Hern. (ECF No. 58-8 at 2-3.) On April 3, 2015, all paperwork in Plaintiff's possession was seized as evidence. (*Id.*)

A report was entered on April 7, 2015, which states that Investigator R. Fonoimoana met with FBI Agent Dave Hern and gave him five envelopes with letters and photographs, two homemade photo albums/scrap books, and one folder with papers that were obtained by Olivas on April 3, 2015. Hern was going to review the items to determine if any child pornography could be identified and evaluate any actionable intelligence connected to the sending party, Leroux. The review subsequently resulted in no child pornography being identified and all items were returned to LCC for return to Plaintiff. (ECF No. 58-5 at 2; ECF No. 58-8 at 2.)

Plaintiff sent a letter to Investigator Keener and Lieutenant Olivas on June 8, 2015. He advised them that he took it upon himself to acquire statements of compliance from the websites "Teen Boys World" and "Gay Teen Studios" and their affiliates, and sent the disclaimers to LCC, which he claimed was proof of the websites' compliance with federal laws that all models are over the age of 18. He asked them to review the disclaimers and have them be taken to the LCC mailroom so that mail staff would cease rejecting his mail from these sites. He said he was also sending a copy of the letter to the Inspector General's Office and asked that the investigation initiated due to Moore issuing an unauthorized mail notification be halted. (ECF No. 58-1.)

On July 22, 2015, Plaintiff sent a letter to Lieutenant Olivas and Investigator Keener, stating that he was sending a copy of several of the websites used by his pen-pal, Leroux, from which Leroux would be sending Plaintiff photos. He was doing so to prove that all models appearing in the photos were over 18 and comply with laws and NDOC regulations. (ECF No. 58-2 at 2.)

On  July 27, 2015, Plaintiff was given an unauthorized mail notification for two 11 x 9 letters from Leroux, which were sent to the investigator for review. (ECF No. 58-15.)

On August 31, 2015, a report was entered which indicated that the review resulted in no child pornography being identified and all items received from LCC were returned to LCC for return to Plaintiff. (ECF No. 58-5 at 2.)

On November 11, 2015, Plaintiff received mail in the LCC mailroom. Plaintiff was served with a notice of charges on November 17, 2015 for an unauthorized photograph that depicted underage boys wearing a sumo style belt/loin cloth with exposed buttocks. (ECF No. 58-9 at 7.) He had a preliminary disciplinary hearing on November 24, 2015. (ECF No. 58-9 at 6.) On December 2, 2015, Plaintiff had a disciplinary hearing where he entered a plea of not

1 guilty. The charges were dismissed and Plaintiff was instructed to write a letter to the sender of

2 the photos asking him to stop sending the material. (ECF No. 58-9 at 3.)

3      On December 3, 2015, Plaintiff sent a letter to Leroux, stating that there had been a

4 problem with the photos of the boys in sumo belts because of their age and the fact that their

5 buttocks could be seen, and they were deemed to be nude photos. He advised Leroux that if such

6 photos were sent again, Plaintiff would face disciplinary sanctions. (ECF No. 58-21.)

7      On December 28, 2015, Plaintiff sent a  letter addressed to LCC Staff, Olivas, Sergeant

8 Gilliland, and the LCC Mailroom Officer, stating that he was resubmitting the statement of

9 compliance as proof that any photos being sent by Leroux meet the laws of the United States and

10 NDOC regulations. He indicated he was recently notified by Leroux that photos from legal

11 websites would be sent in the future and he hoped to alleviate any problems receiving these

12 photos. (ECF No. 58-3 at 2.)

13      On January 11, 2016, Plaintiff was issued an unauthorized property notification[1] for three

14 photo albums which were noted to contain photos of naked teenagers, two manila envelopes, and

15 one folder containing a notebook. (ECF No. 58-19.)

16      Plaintiff filed informal level grievance 20063017961 on February 16, 2016, stating that

17 Olivas violated his rights by contacting outside law enforcement, the Mohave County Sheriff's

18 Office (MCSO), to have them contact another of Plaintiff's pen pals, George Mead, and threaten

19 him to alter or discontinue correspondence with inmates within NDOC. Plaintiff claimed that on

20 December 22, 2015, Olivas contacted Sue Callahan of the MCSO and sent the letter and photos

21 received in the LCC mailroom from Mead. Plaintiff claims that Callahan called Mead and left a

22 message stating that she had received a call from Olivas indicating that Mead was sending mail

23

---

[1] This is an unauthorized *property* notification and not an unauthorized *mail* notification.

1   to LCC. Callahan reportedly told Mead he was "walking a really thin line" and ask that he stop

2   sending things to Nevada inmates.

3        The grievance goes on to state that on January 8, 2016, Mead sent him an envelope

4   containing several photos, but Plaintiff did not receive them and they were not sent back to

5   Mead. Then, on February 5, 2016, Mead sent two photos, both were of males. One was in briefs

6   and the other was nude. Plaintiff acknowledged that the photos came from the "Teen Boys

7   World" website, but Plaintiff maintained that the males were of legal age.

8        Plaintiff asserts that Mead was contacted again by Callahan on February 9, 2016, and was

9   told that she was contacted by Olivas and advised that Mead was sending inappropriate photos to

10  sex offenders. Callahan told him he was no longer allowed to send mail to Nevada prisoners. He

11  claimed that Olivas denied him and Mead their rights by failing to notify them of the action

12  taken or allow them to appeal the decision for rejecting the mail. (ECF No. 58-20 at 12, 14-24.)

13       D. Baze responded to the informal level grievance, stating that Plaintiff failed to provide

14  documentation to support his claims against Olivas overstepping her authority or violating his

15  rights. Baze stated that Plaintiff received unauthorized property notifications for all property

16  taken. (ECF No. 58-20 at 13.)

17       Plaintiff filed a first level grievance on March 27, 2016. (ECF No. 58-20 at 9-11.) Byrne

18  responded to the first level grievance, stating that Olivas documented and gave Plaintiff notice

19  every time something was taken for investigation or was unauthorized due to content. Byrne

20  found no evidence of tampering or violating his due process rights as Plaintiff had the

21  opportunity to grieve and receive most items back after further review. (ECF No. 58-20 at 8.)

22       Plaintiff filed a second level grievance. (ECF No. 58-20 at 3, 5-7.) D. Tristan responded

23  that Plaintiff did not attach any document to substantiate his allegations. (ECF No. 58-20 at 4.)

On April 10, 2016, Plaintiff sent a kite to Carpenter asking for the return of three photo albums of previously approved photos and a personal journal that were confiscated from his cell on January 11, 2016. He stated that the photos were reportedly in the possession of Olivas. The response states: "I need to see why they were taken. Attach your unauthorized." (ECF No. 58-5 at 2.)

On April 20, 2016, LCC's mailroom unauthorized incoming mail to Plaintiff due to a photograph containing minor males/boys in sumo attire where the buttocks were exposed. (*See* ECF No. 58-10 at 7.) A notice of charges was served on Plaintiff dated April 21, 2016, for unauthorized use of mail, related to this photograph. (*Id*.)  A preliminary hearing was held on April 22, 2016, where Plaintiff alleged that Olivas was harassing and retaliating against him. (ECF No. 58-10 at 8.)

Plaintiff sent a kite to Sergeant Gilliland on May 16, 2016, asking that the photos that were rejected by Olivas, for which he received a notice of charges, be sent to the Inspector General's Office, because he claimed the photo was legal. (ECF No. 58-10 at 9.)

Plaintiff had a disciplinary hearing on May 19, 2016, and Plaintiff entered a plea of not guilty. Olivas testified that one of the pictures depicted an underage boy in a sumo belt which showed his bare buttocks. George Mead, who sent the pictures, testified that he sent a picture of a boy in a sumo belt but there was no nudity. Plaintiff said he did not ask to have nude pictures sent in. Plaintiff was found guilty and given 18 months in disciplinary segregation. (ECF No. 58-10 at 2-5.) He was held in disciplinary segregation from May 19, 2016 through July 25, 2016, because through the appeal process the sanction was reduced to time served. (*See* ECF No. 58-16 at 23; ECF No. 60-1 at 14.)

On June 16, 2016, Plaintiff sent a kite to Sandie, stating that he was sending four kites, three letters and four statements of compliance so that Sandie could take appropriate action in instructing LCC staff in mailroom operations. He claimed that there was a discriminatory practice of rejecting photos from legal websites. He asked that the statement of compliance be delivered to the mailroom. The response states: "You can have the pictures of individuals who are over 18. We will <u>not</u> allow you to have nude pictures of children." (ECF No. 58-6 at 2.)

A case note from August 19, 2016, states that Plaintiff appeared before the full classification committee and said he would like to go to "SSLP" at Northern Nevada Correctional Center (NNCC), but he has to be disciplinary free for one year, so he would have to wait until May 19, 2017, to apply for that program. Belanger updated the case note on August 23, 2016, to state that she talked to Plaintiff about transferring to general population at Warm Springs Correctional Center (WSCC), and Plaintiff said he would refuse if they made him go there. He claimed to have enemies there but refused to give names. It was noted that he would be submitted for protective segregation at High Desert State Prison (HDSP). (ECF No. 60-1 at 15.) On that same day, it was recommended that Plaintiff be transferred to protective segregation at HDSP. The note states: "Inmate has become too familiar with staff at LCC – he has been housed here off and on since 2001- needs a fresh start at another facility." (*Id.*)

Plaintiff sent a letter to Dzurenda on November 23, 2016, asking him to take action to stop staff from transferring him to another institution in retaliation for filing grievances to correct wrongs committed by LCC staff. He noted that LCC staff failed to take action for contacting outside law enforcement agencies to harass private citizens and rejecting allowable mail. (ECF No. 63 at 25-27.)

On November 30, 2016, Plaintiff sent a kite to caseworker Bellinger, stating that he spoke to her on November 28, 2016, about whether or not another former LCC inmate who was on his enemy list was housed at HDSP, in the protective segregation unit where Plaintiff would need to be housed. He asked that every attempt be made to transfer him to NNCC so he could participate in the SSLP program. (ECF No. 58-11 at 2.) A case note from January 3, 2017, states that Plaintiff was frustrated because he had been waiting for his approved transfer since August. (ECF No. 60-1 at 15.) On January 27, 2017, Plaintiff was transferred to High Desert State Prison (HDSP) in protective segregation. (ECF No. 60-1 at 16.)

**B. Retaliation**

**1. Legal Standard**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

**2. Analysis**

Plaintiff alleges that Defendants retaliated against him by denying him mail, bringing false charges against him, and transferring him to another prison.

Defendants have provided evidence that Plaintiff was denied his mail while it was investigated whether or not it contained unauthorized material, i.e., nude or partially nude males under the age of 18.

The evidence reflects that charges were brought against Plaintiff on November 17, 2015, regarding the photograph sent to Plaintiff depicting boys wearing sumo attire with exposed buttocks. At his hearing, the prison statement was that the photos were of questionable nature and could be detrimental to rehabilitation of prisoners. Ultimately, these charges were dismissed and Plaintiff was instructed to ask the sender to stop sending these materials. Plaintiff received a second notice of charges on April 21, 2016, again related to photos of minor males in sumo attire. At a hearing on May 19, 2016, Plaintiff was found guilty and sentenced to disciplinary segregation.

Finally, the evidence reflects that Plaintiff said he wanted to be transferred to NNCC to participate in SSLP, but was told he would have to wait because he had to be disciplinary free for one year to apply for that program. He was offered a transfer to WSCC, but he said he would refuse to go there. Ultimately, he was submitted for transfer to protective segregation at HDSP. His case note states that he had been housed at LCC for some time and needed to go to a new facility for a fresh start.

Plaintiff asserts that his mail and photographs were intercepted, that charges were brought against him, and he was transferred because of his grievance filing; however, he points to no *evidence* to support this argument. An inmate must submit *evidence*, either direct or

circumstantial, to establish a *link* between the exercise of constitutional rights and the alleged

retaliatory action. *Pratt*, 65 F.3d at 806-07. "[A] plaintiff must show that his protected conduct

was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 584

F.3d 1262, 1271 (9th Cir. 2009) (citation and quotation marks omitted). A plaintiff's mere

speculation that there is a causal connection is not enough to raise a genuine issue of material

fact. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of

summary judgment where there was no evidence that defendants knew about plaintiff's prior

lawsuit, or that defendants' disparaging remarks were made in reference to the prior lawsuit);

*Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted)

("mere allegation and speculation do not create a factual dispute for purposes of summary

judgment").

Plaintiff's speculation that the adverse conduct was retaliatory is insufficient to defeat

Defendants' motion for summary judgment. While Plaintiff says he filed a multitude of

grievances, Plaintiff provides no evidence to connect the grievances to the actions of interfering

with his mail, the notice of charges, or his transfer. Therefore, summary judgment should be

granted in Defendants' favor as to the retaliation claim.

**C. First Amendment Interference with Mail and Photographs**

**1. Letters/Photographs Returned to Plaintiff**

Plaintiff's response acknowledges that all of the mail/photographs that were initially

confiscated were returned to him with the exception of the photos from Mead that Plaintiff

claims Olivas sent to the MCSO.

In *Crofton v. Roe*, 170 F.3d 957 (9th Cir. 1999), the Ninth Circuit held that a temporary

delay in delivering an inmate's publications while they were subject to a prison security

1  inspection did not violate the inmate's First Amendment rights. *Crofton*, 170 F.3d at 961.

2  Plaintiff acknowledges that most his mail items at issue were withheld while an investigation

3  was conducted determining whether they contained child pornography, which the court finds is a

4  legitimate penological purpose. Plaintiff has produced no evidence to support his argument that

5  the items were withheld because of a Defendants' personal biases toward Plaintiff or regarding

6  the content of the items.

7        Even if the delay in receiving these items did not come within the holding of *Crofton v.*

8  *Rowe*, it was not clearly established that withholding this mail while an investigation was being

9  conducted regarding whether the items contained child pornography or were otherwise

10 unauthorized violated the First Amendment. *See Gordon v. County of Orange*, 6 F.4th 961, 967

11 (9th Cir. 2021) (citing *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001), *overruled in part by*

12 *Pearson v. Callahan*, 555 U.S. 223 (2009)) (defendant is entitled to qualified immunity if the

13 right was not clearly established at the time of the alleged misconduct)).

14       As such, summary judgment should be granted in Defendants' favor on his First

15 Amendment claim insofar as he admits that most of the items were only withheld from him

16 temporarily while it was determined whether the items contained child pornography.

17       The court will now address the First Amendment claim with respect to the photos sent

18 from Mead that Plaintiff claims Olivas sent to the Mojave County Sheriff's Office.

19       **2. Letters/Photographs Plaintiff Claims Were Not Returned**

20             **a. Legal Standard**

21       Prisoners enjoy a First Amendment right to send and receive mail. *Witherow v. Paff*, 52

22 F.3d 264, 265 (9th Cir. 1996). Their First Amendment rights, however, are "necessarily limited

23 by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals

1 | or to maintain prison security." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987). Courts

2 | "apply a deferential standard of review to challenges regarding prison regulations[.]" *Mauro v.*

3 | *Arpaio,* 188 F.3d 1054, 1058 (9th Cir. 1999). A regulation that impinges on an inmate's First

4 | Amendment rights is valid if it "is reasonably related to legitimate penological interests" *Id.*

5 | (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

6 |        To determine the validity of a prison regulation, courts apply the test established in

7 | *Turner v. Safley*, which considers four factors: (1) whether there is a valid, rational connection

8 | between the regulation and the legitimate governmental interest the regulation is designed to

9 | protect; (2) whether the prisoner has alternative means of exercising the right at issue; (3) the

10 | impact any accommodation would have on guards, other inmates, and allocation of prison

11 | resources; and (4) whether there are 'ready alternatives' for furthering the government interest,

12 | which would suggest that the regulation is an exaggerated response to the prison's concern.

13 | *Turner*, 482 U.S. at 89-90.

14 |        The Supreme Court has recognized that there are greater security concerns for incoming

15 | mail than for outgoing mail. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

16 | **b. Letters/Photos at Issue**

17 |        Defendants have presented evidence of the occasions when letters/photographs sent to

18 | Plaintiff were deemed unauthorized.

19 |        Plaintiff does not identify what specific letters/photographs from Mead he claims Olivas

20 | sent to the MCSO were not returned to him. In his grievance, Plaintiff said that Olivas contacted

21 | the MCSO for the first time on December 22, 2015, and sent the letters/photographs received in

22 | the LCC mailroom from Mead. Up to that point, however, the evidence demonstrates that all

23 | unauthorized mail had been from Leroux, with the latest instance involving a photo of boys in

16

1    sumo attire with their buttocks exposed (or partially exposed). There is no declaration from

2    Plaintiff or Mead about any items sent to Plaintiff that Plaintiff did not receive prior to Olivas

3    allegedly contacting the MCSO on December 22, 2015.

4        In his *grievance*, Plaintiff mentions that Mead sent him an envelope on January 8, 2016,

5    that Plaintiff did not receive; however, the grievance does not describe what was depicted in the

6    photograph(s). Nor is there a *declaration* from Plaintiff or Mead describing what was in the

7    photograph(s) sent on January 8, 2016.

8        The only other reference to Mead is Plaintiff's statement in his grievance that on

9    February 5, 2016, Mead sent two photos of males, one in briefs and the other nude, from the

10   website "Teen Boys World." In the grievance, Plaintiff maintained that the males were of legal

11   age.

12       Plaintiff did received an unauthorized mail notification on April 20, 2016, for another

13   photo containing minor males in sumo attire with exposed buttocks, but the notice of charges

14   does not list the sender.

15       Since Plaintiff does not specifically identify the photographs/letters he claims were not

16   returned, the court will address those that were actually identified in his grievance as he has not

17   created a genuine dispute of material fact with respect to any other letters/photographs.

18       **c. Analysis**

19       First, the court must determine whether there is a valid, rational connection between the

20   regulation and the legitimate governmental interest the regulation is designed to protect. This

21   requires the court to "determine whether the objective underlying the policy is (1) legitimate,

22   (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Mauro*, 188 F.3d

23   at 1059 (quoting *Thornburgh,* 490 U.S. at 414).

1    The policy at issue here is prohibiting inmates from possessing photos of minors that are

2  nude or partially nude.

3    Defendants motion asserts that the legitimate governmental interest justifying such a

4  restriction is the goal of rehabilitation of inmates back into society. Defendants note that Plaintiff

5  is a convicted child sex offender and he was receiving photos from a paroled child sex offender

6  (Mead). (Olivas Decl., ECF No. 60-2 ¶ 5.) Defendants argue that sending photos of a minor that

7  contain nudity could harm Plaintiff's rehabilitation.

8    The Ninth Circuit has held that, "[i]n the prison context, regulations that apply to specific

9  types of content due to specific inherent risks or harms are considered to be content neutral."

10 *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004); *see also Mauro,* 188 F.3d at 1059.

11 Where "prison administrators draw distinctions between publications solely on the basis of their

12 potential implications for prison security, the regulations are 'neutral' in the technical sense in

13 which we meant and used that term in *Turner.*" *Id.* (citation omitted). The Ninth Circuit held in

14 *Mauro* and in *Bahrampour v. Lampert,* 356 F.3d 969 (9th Cir. 2004), that regulations prohibiting

15 sexually explicit materials were neutral. *Bahrampour*, 356 F.3d at 976; *Mauro,* 188 F.3d at 1059.

16 In *Bahrampour* and *Mauro,* the court held that the restrictions were neutral because they targeted

17 the effects of the materials "rather than simply prohibiting broad selections of innocuous

18 materials." *Bahrampour,* 356 F.3d at 976; *see also Mauro*, 188 F.3d at 1059 ("jail administrators

19 drew a distinction between materials solely on the basis of the materials' potential effect on the

20 prison's legitimate objectives."). In *Thornburgh*, the Supreme Court similarly found that prison

21 administrators were drawing distinctions between publications "solely on the basis of their

22 potential implications for prison security[;]" and therefore, the regulations were "neutral" in the

23 technical sense. *Thornburgh*, 490 U.S. at 415-16.

1  Plaintiff provides no *evidence* that this was simply a prohibition on a broad selection of

2  innocuous materials. Therefore, the court similarly finds that a policy that precludes the

3  possession of nude or partially nude photos of minors to be "neutral."

4  Next, the court finds that there is no doubt that rehabilitation of offenders is a legitimate

5  penological interest. *See Mauro*, 188 F.3d at 1059 ("It is beyond question that both jail security

6  and rehabilitation are legitimate penological interests.") (citing *Thornburgh,* 490 U.S. at 415

7  (prison security); *Turner*, 482 U.S. at 91 (prison security); *Pell v. Procunier,* 417 U.S. 817, 823

8  (1974) (rehabilitation); *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974) (prison security,

9  order and rehabilitation).

10  Finally, the court finds that the policy is rationally related to the legitimate governmental

11  interest. "[P]rison officials need not prove that the banned material actually caused problems in

12  the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188 F.3d at

13  1060 (citations omitted). "Moreover, it 'does not matter whether we agree with' the defendants

14  or whether the policy 'in fact advances' the jail's legitimate interests." *Id*. (citation omitted).

15  "The only question we must answer is whether the defendants' judgment was 'rational,' that is,

16  whether the defendants might reasonably have thought that the policy would advance its

17  interests." *Id*.

18  The court finds that the policy of not allowing inmates, and sex offenders in particular, to

19  possess nude photographs of minors has a rational relationship with the prison goal of

20  rehabilitation.

21  In *Mauro*, the plaintiff argued that the policy of prohibiting sexually explicit materials

22  was not rationally related because it gave employees "unbridled discretion." *See Mauro*, 188

23  F.3d at 1060, n. 5. The Ninth Circuit rejected that argument, explaining that *Thornburgh* made

clear that "regulations which give broad discretion to prison authorities are appropriate where the regulations concern materials *coming into* the prison." *Id*. (citing *Thornburgh*, 490 U.S. at 416).

In *Thornburgh*, the Supreme Court explained:

> [P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, the Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh*, 490 U.S. at 408 (citation omitted).

Therefore, the first *Turner* factor weighs in Defendants' favor.

The second *Turner* factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials … in gauging the validity of the regulation." *Id*.

In *Turner*, the Supreme Court upheld a regulation that restricted correspondence between inmates at different prisons, rejecting the argument that inmates should have other means to communicate with inmates at other prisons and found it sufficient that the inmates had other means of expression. *Turner*, 482 U.S. at 92. In *Thornburgh*, the Supreme Court upheld a restriction on inmate publications, finding that the regulations otherwise permitted a broad range of publications. *Thornburgh*, 490 U.S. at 417-18. In *Mauro*, the Ninth Circuit upheld the ban on sexually explicit materials*,* finding that the policy bans sexually explicit materials depicting frontal nudity, but did not ban sexually explicit letters between inmates or sexually explicit articles or photographs of clothed persons. *Mauro*, 188 F.3d at 1061.

Here, the court likewise finds that alternative means of exercising the right remain open to inmates. As was pointed out in the evidence, Plaintiff was not prohibited from having similar photos of males that were not minors. Moreover, like *Mauro,* the regulations do not prohibit photographs of clothed persons. Therefore, this factor weighs in Defendants' favor.

The third factor is the impact accommodation of the right would have on prison personnel, other inmates and the allocation of prison resources. *Turner,* 482 U.S. at 90. "This factor requires [the court] to determine the impact of allowing inmates unrestricted access to" photographs of nude or partially nude minors. *Mauro,* 188 F.3d at 1061. The impact would likely be significant, particularly in terms of rehabilitation for sex offenders. Moreover, the impact on the children depicted in the images would undoubtedly be serious. Therefore, this factor also weighs in Defendants' favor.

The final factor is whether the policy is an exaggerated response to the prison's concerns.

> The absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner,* 482 U.S. at 90-91.

"The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Mauro,* 188 F.3d at 1062 (citations omitted).

1    Here, Plaintiff has not pointed to any ready alternatives. Therefore, this factor also

2  weighs in Defendants' favor.

3    That does not end the court's inquiry. In *Bahrampour*, the Ninth Circuit pointed out that

4  to defeat summary judgment an inmate plaintiff "must demonstrate that the regulations are not

5  reasonably related to legitimate penological interests, *or* that there is a genuine issue of material

6  fact regarding the applicability of the regulations to the materials." *Bahrampour*, 356 F.3d at 973

7  (emphasis added, citing *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)). The

8  court has already concluded that Plaintiff has not demonstrated the policy is not reasonably

9  related to legitimate penological interests. The court must also consider whether he has raised a

10  genuine dispute of material fact regarding whether the materials at issue contained the prohibited

11  content.

12    In *Bahrampour*, two levels of prison officials found the materials violated the regulations.

13  The district court reviewed the materials *in camera* and agreed. The Ninth Circuit also reviewed

14  the materials, and agreed that they violated the regulations. The court found the plaintiff did not

15  produce sufficient evidence to show that "any reasonable person would conclude that" the

16  materials did not violate the regulations by containing role-playing or fantasy content or sexually

17  explicit material. *Bahrampour*, 356 F.3d at 974.

18    Here, with respect to the photos from the "Teen Boys World" website, Plaintiff

19  acknowledges that the photo contained photos of males who were nude or partially nude.

20  Plaintiff claimed in his *grievance* that the males were of legal age; however, he has provided no

21  evidence in response to the motion for summary judgment to substantiate his argument that the

22  photos did not violate any laws or regulations. His grievance references statements of

23  compliance from the website for the photos, but he has not submitted this evidence to the court.

With respect to the photo of the boy in sumo attire, Plaintiff does not dispute that the photograph in question showed the exposed buttock of minor male. Nor has he provided any other evidence or argument to raise a genuine issue of fact as to whether this violated NDOC policy.

Finally, Plaintiff argues in his response to Defendants' motion that he and the senders were not given notice when mail was rejected, but he provides no *evidence* to support this argument and fails to specify the occasions he contends Defendants did not provide him or the sender with notice that his mail was being rejected/deemed unauthorized.

In conclusion, summary judgment should be granted in Defendants' favor as to the remainder of Plaintiff's First Amendment claims.

**D. Equal Protection**

The Fourteenth Amendment prohibits the denial of "the equal protection of the laws." U.S. Const., amend XIV, § 1. This "is essentially a direction that all persons similarly situated should be treated alike." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

Where, as here, the allegations do not implicate a protected class, a plaintiff may establish a "class of one" equal protection claim by demonstrating that he or she "has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Plaintiff alleges that Olivas denied him access to erotic photographs from legal pornographic websites even though other inmates were allowed access to similar photos. In addition, he avers that he was denied access to a photo of semi-nude boys in traditional sumo

1 attire, even though this did not violate regulations and other inmates were allowed to possess

2 similar photos of semi-nude minors.

3      Defendants contend Plaintiff is not permitted to possess photographs of nude minors, and

4 Plaintiff has no evidence of other inmates that have been able to possess such photographs.

5      Plaintiff has failed to create a genuine dispute of material fact by demonstrating through

6 evidence that other inmates were allowed to access and possess similar photos that Plaintiff was

7 denied. Therefore, summary judgment should be granted in Defendants' favor with respect to the

8 equal protection claim.

9 **E. Conclusion**

10      Summary judgment should be granted in Defendants' favor. As a result, the court need

11 not consider Defendants remaining arguments.

12      Plaintiff's response includes arguments about his due process rights being violated at his

13 disciplinary hearing, but he was not allowed to proceed with a due process claim related to his

14 disciplinary hearing in this action. Therefore, the court has not considered those arguments.

15                          **IV. RECOMMENDATION**

16      IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING**

17 Defendants' motion for summary judgment (ECF No. 58).

18      The parties should be aware of the following:

19      1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

20 this Report and Recommendation within fourteen days of being served with a copy of the Report

21 and Recommendation. These objections should be titled "Objections to Magistrate Judge's

22 Report and Recommendation" and should be accompanied by points and authorities for

23 consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 8, 2021

_William G. Cobb_
William G. Cobb
United States Magistrate Judge